UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

TIANNA A. LINTON,

     Plaintiff,

       v.

ACCESS WORLDWIDE
COMMUNICATIONS, INC.

     Defendant.

Civil Action No.

**COMPLAINT**
**JURY TRIAL REQUESTED**
**INJUNCTIVE RELIEF REQUESTED**

NOW COMES the Plaintiff, Tianna A. Linton ("Plaintiff" or "Linton"), by and through

undersigned counsel, and complains against the Defendant, Access Worldwide Communications,

Inc.  ("Defendant" or "Access"), as follows:

INTRODUCTION

1.      This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551

et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and Title VII of

the Civil Rights Act of 1964 as amended by the Pregnancy Discrimination Act of 1978 ("Title

VII/PDA"), 42 U.S.C. §§ 2000e et seq.

PARTIES

2.      Linton is a United States citizen residing in Auburn, Maine.

3.      Access is a Delaware corporation with corporate headquarters in Boca Raton,

Florida.

4.      Access operates a call center in Augusta, Maine.

<u>JURISDICTION</u>

5.      Access has more than 5,000 associates in offices throughout the Americas, Europe and Asia.

6.      Access had 20 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

7.      The parties are citizens of different states for purposes of diversity jurisdiction.

8.      The amount in controversy in this case exceeds $75,000.

9.      This Court has subject matter jurisdiction over Linton's federal and State claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

10.     On September 3, 2014, Linton filed a timely Charge/Complaint of Discrimination against Access alleging unlawful disability and sex (pregnancy) discrimination and retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

11.     On or about May 18, 2015, the MHRC issued a Notice of Right to Sue with respect to Linton's State law claims.

12.     On or about May 13, 2015, the EEOC issued a Notice of Right to Sue with respect to Linton's federal law claims.

13.     Linton has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

<u>FACTUAL ALLEGATIONS</u>

14.     Linton worked for Access as a Customer Service Representative (CSR) from January 6, 2014 until her involuntary termination on May 2, 2014.

15.     Linton was qualified for the CSR job.

16.     Linton's job performance was satisfactory.

17.     Linton has suffered from migraine headaches for about 13 years and severe anxiety for about two years. Linton takes medications to control the effects of these conditions.

18.     Linton was pregnant when she was hired by Access. Linton's pregnancy was not noticeable. Linton did not inform Access that she was pregnant.

19.     Linton told her co-workers and supervisors about her pregnancy in mid- to late-January 2014.

20.     Access admitted in its response to the MHRC that Linton told Team Lead Michael King that she was pregnant.

21.     To protect her baby during pregnancy, Linton avoided taking prescribed medications for migraines and anxiety.

22.     Linton's migraine headaches are a disability and a pregnancy-related medical condition since Linton avoided taking medication for migraines due to her pregnancy.

23.     The team Linton worked with consisted of about 15 CSRs, a Performance Specialist (a type of coach), and a Team Senior, all of whom were supervised by the Team Lead. The Team Lead reported to a Floor Manager, who reported to the Center Manager.

24.     On Linton's team, the Performance Specialist was Maxine (LNU), the Team Senior was Jessica Nelson, and Team Lead King. The Floor Manager was Brad J. White. The Center Manager was Travis Dorr. The Senior HR Assistant at the Augusta, Maine location was Jasmine Carey.

25.     Access has an Attendance and Punctuality Policy which uses a point system for assessing discipline. Employees receive points for tardiness, unapproved absences, and other

attendance issues. Employees are subject to verbal warning (4 points), written warning (8 points), unpaid suspension (10 points), and termination (14 points).

26.     Tardiness is defined as missing one to 90 minutes of an assigned schedule.

27.     Unapproved absences include absences for which an employee had a doctor's note as well as other absences including failure to notify (no call, no show).

28.     Although the Attendance and Punctuality Policy appears objective, there was discretion and the policy was applied unevenly. Human Resources employees could decide whether or not to impose points. The Center Manager also had authority to waive points.

29.     On Monday, March 3, 2014, Linton received one point for leaving early.

30.     Linton told Mr. White that she needed to leave early because of a migraine headache she got from smelling paint fumes the previous day.

31.     The migraine was so bad that Linton was throwing up.

32.     Linton's midwife told her to leave work immediately and go home.

33.     In an email from Mr. White to Ms. Carey dated Monday, March 3, 2014 at 6:41 PM, Mr. White quoted Linton as saying: "I painted all day yesterday and I have been sick throwing up all day today. I called my doctor and she told me that I need to leave work immediately and go home. If I'm still sick in a bit, I have to go to the ER" . . . . . "I should be back tomorrow."

34.     Mr. White expressed animus toward Linton because of her disability and pregnancy in the same email. He wrote, "This is going to be a giant issue…Absolutely no lee-way w/points."

35.     On Tuesday, March 4, 2014, Linton stayed home on the advice of her midwife because she was still sick with a migraine headache.

4

36.     Linton received two points for an unapproved absence on Tuesday, March 4, 2014.

37.     Linton told Access that she was absent on March 3 and 4, 2014 due to her migraine headache which is a disability- and pregnancy-related medical condition.

38.     As of March 4, 2014, Linton had four attendance points on her record.

39.     On March 5, 2014, Linton was given a verbal warning for unexcused absence and tardiness/early departure by supervisor Rhonda Cole.

40.     Linton explained to Ms. Cole that she was absent on March 3 and 4, 2014 due to a migraine headache.

41.     Ms. Cole seemed sympathetic but she told Linton that it would do no good to get a note from her midwife because Access would not accept it.

42.     Linton was denied the reasonable accommodation of a medical leave of absence (no points) on March 3 and 4, 2014.

43.     Linton was scheduled to work on Saturday, March 8, 2014, but arranged to switch shift with a co-worker and worked instead on Thursday, March 6, 2014.

44.     Mr. White tried to impose more points on Linton even though she had permission to switch shifts.

45.     Mr. White reported to Ms. Carey in HR that Linton was on the schedule but not in attendance on March 8, 2014.

46.     On Tuesday, March 11, 2014, Mr. White wrote to Ms. Carey, "… [Linton] is going to need constant attendance interaction. Guaranteed. Point out quickly."

47.     "Point out quickly" was Mr. White's way of saying that Linton should be quickly given enough points to justify terminating her.

48.    Ms. White's request that HR "point [Linton] out quickly" is evidence of animus toward Linton because of her pregnancy and disability.

49.    From March 11 through March 19, 2014, Linton received seven points for being absent (from March 11 to 14), leaving early (March 17), and being absent again (March 18 to 19, 2014).

50.    During that time frame, Linton was continuously sick with a cold, diarrhea and migraine headache.

51.    Linton kept in touch with Human Resources (HR) about the reasons for her absence.

52.    HR called and fired Linton during that absence stating that Linton was supposed to get doctor's notes faxed to the company.

53.    Access's Attendance Policy FAQS reads in part: "Doctor's notes must be received immediately; if you're out for three or more days a doctor's not (sic) is required & must be provided to HR within one day of your appointment date if you're remaining out longer or the day you return to work if you're returning the day of/after your appointment."

54.    When Linton explained to HR that she thought she needed to bring her doctor's note with her on the day she returned to work, HR withdrew the termination.

55.    Because of the threat to Linton's employment, she tried to return to work on Monday, March 17, 2014 before she had recovered her health.

56.    Linton worked more than four hours that day but she was too sick to work and had to leave and was absent again for the next two days.

57.    Linton was denied the reasonable accommodation of a medical leave of absence for her absences and need to leave for disability- and pregnancy-related reasons.

58.     By imposing the maximum number of points for the days and part-days that Linton was absent for a single illness, Linton was punished more severely than non-disabled, non-pregnant employees who are absent due to illness for multiple days.

59.     On March 21, 2014, Linton received one point for arriving four minutes late to work.

60.     There are many non-pregnant, non-disabled employees who arrived late to work and are not given points.

61.     For example, Heather Haley was late almost every single day. Ms. Haley was tardy so often that employees joked about it when she was on time. Upon information and belief, Ms. Haley did not get points for being late.

62.     Access employees clock in by logging in to their computers.

63.     Access's Time Tracker (or JESS log in system) records will show that Ms. Haley and other employees were frequently tardy and did not receive points.

64.     Access did not provide Time Tracker (or JESS log in system) records to the MHRC, which suggests that Linton's allegations in paragraphs 57-60 are correct.

65.     Linton had 12 attendance points as of March 21, 2014.

66.     On March 26, 2014, Mr. King gave Linton a written warning and a final written warning for unexcused absence and tardiness/early departure.

67.     Also on March 26, 2014, Linton turned in a note from her midwife on a prescription pad from MaineGeneral Midwifery Services that read, "Please allow Tianna to use the bathroom as needed. Thank you."

68.     Access has taken the position that there was no mention of Linton's pregnancy when she requested that she be allowed to use the bathroom as needed even though the medical note submitted by Linton in support her request was from MaineGeneral Midwifery Services.

69.     Like most women, Linton had to urinate more frequently than average because of her pregnancy, hence the need for more bathroom breaks.

70.     Access granted Linton's accommodation request but with the restriction that Linton take no more than an extra 15 minute break.

71.     A co-worker with Crohn's Disease was being provided with the accommodation of more bathroom break time without restriction when Linton made her request.

72.     After Linton turned in her note, Access imposed restrictions on the bathroom breaks the other employee was permitted to take. He too was limited to an extra 15 minute break.

73.     Upon information and belief, Access viewed Linton's request for a pregnancy-related reasonable accommodation as burdensome.

74.     On Wednesday, April 2, 2014, Linton had an anxiety attack at work.

75.     A co-worker, Dawn, saw Linton crying in the hallway. Linton asked Dawn to get Mr. King and have him meet Linton in the HR office with Ms. Carey.

76.     When Linton met with Mr. King and Ms. Carey, it was apparent to them that Linton was in no shape to work.

77.     Mr. King and Ms. Carey gave Linton permission to go to the doctor without getting another point as long as Linton returned after the appointment to finish her shift.

78.     When Linton left, Maxine, the Performance Specialist, and Linton's Team Senior, Jessica Nelson, were gossiping about Linton "using" her pregnancy as an "excuse to get out of work."

8

79.     Dawn heard them talking and put in a formal complaint to HR on Linton's behalf.

80.     Linton did not know about Dawn's complaint until two weeks later, when Dawn told Linton about it.

81.     Dawn did not want tell Linton what Maxine and Jessica said.

82.     Linton went to HR to find out what happened.

83.     Linton was told they could not tell her.

84.     A couple of days later, Maxine got into an altercation with another employee and was demoted. Jessica stayed on Linton's team.

85.     Linton believes that the negative attitude expressed about her pregnancy by co-workers is similar to the animus expressed about her by Mr. White.

86.     On another day, Linton had to leave work early because workers were painting the building and she became sick with a migraine headache from the fumes.

87.     Ms. Carey was going to give Linton points for leaving.

88.     Linton argued that it was not safe for her or her baby to work around paint fumes.

89.     Ms. Carey told Linton to talk to Mr. White.

90.     Mr. White told Linton that she could leave but that she should not tell anyone that she had permission to leave without getting a point.

91.     On April 28, 2014, Linton received one more point for leaving work early.

92.     Linton left work early because she had a migraine headache and was not taking migraine medication due to her pregnancy.

93.     Linton went to MGMC Express Care for treatment and was advised to take Tylenol for pain and ginger for nausea.

94.     Linton got a note from MGMC Express Care excusing her from work on April 28th and 29th, but she went to work on the 29th anyway because she was concerned about keeping her job.

95.     Linton had 13 absence points and knew that she would be terminated if she accumulated 14.

96.     On May 1, 2014, Linton came down with a cough but worked her whole shift even though she was sick.

97.     That night, Linton developed a headache and a fever.

98.     On May 2, 2014, Linton went to work and tried to make it through the day.

99.     Linton's temperature went up to 101 F.

100.    Linton's midwife advised her that a temperature of 101 or higher could be harmful to her baby.

101.    Linton went to Human Resources and spoke to Ms. Carey.

102.    Linton told Ms. Carey that her fever was too high and that Linton was concerned about her baby.

103.    Ms. Carey told Linton that if she left, Linton would get more points and would be terminated.

104.    Linton collected her things, left work, and went for medical treatment at MGMC Express Care.

105.    Linton had taken Tylenol so her temperature was down to 99.9 F when she was seen at MGMC Express Care.

106.    Linton got a note from MCMC Express Care excusing her from work on May 2 and May 3, 2014.

10

107.    Linton called Ms. Carey after her doctor's appointment.

108.    Ms. Carey told Linton that she was terminated.

109.    Ms. Carey prepared a Notice of Employee Separation stating that Linton was terminated for absenteeism/tardiness.

110.    The stated reason for termination given by Access to the MHRC was "violating attendance policy, which centers on a point system. [Linton] exceeded the points total and was terminated."

111.    The real reason for Linton's termination was pregnancy discrimination, disability discrimination, and retaliation because Linton requested and required reasonable accommodations for her disabilities and pregnancy-related medical conditions.

112.    Twelve out of the 15 points assessed against Linton were based on her pregnancy and/or disability.

113.    Four points were given to Linton for absences caused by migraine headaches: one on March 3, two on March 4, and one on April 28, 2014.

114.    Seven points were given to Linton for absences that were caused in part by a migraine headache.

115.    The number of points given to Linton was punitive and motivated by pregnancy discrimination.

116.    One point was given to Linton for tardiness on March 21, 2014. That point was assessed punitively due to pregnancy discrimination.

117.    Linton would not have been terminated but for sex (pregnancy) discrimination in violation of the MHRA and Title VII/PDA.

118.    Linton would not have been terminated but for disability discrimination in violation of the MHRA and the ADA.

119.    Linton would not have been terminated but for retaliation for her request and need for reasonable accommodations for her pregnancy- and disability-related conditions in violation of the MHRA, the ADA, and Title VII/PDA.

120.    Linton's requests for leave for her disabilities were requests for reasonable accommodations for purposes of the MHRA and ADA.

121.    Access failed to accommodate Linton's need for leave and instead disciplined and terminated Linton.

COUNT I: MHRA
Unlawful Sex (Pregnancy) Discrimination

122.    Paragraphs 1-121 are incorporated by reference.

123.    Access's conduct constitutes unlawful sex (pregnancy) discrimination against Linton in violation of the MHRA.

COUNT II: MHRA
Unlawful Disability Discrimination

124.    Paragraphs 1-123 are incorporated by reference

125.    Access's conduct constitutes unlawful disability discrimination in violation of the MHRA

COUNT III: MHRA
Unlawful Retaliation

126.    Paragraphs 1-125 are incorporated by reference.

127.    Access's conduct violated the MHRA by retaliating against Linton because she required and used medical leave as a reasonable accommodation for her disability and her pregnancy-related condition.

12

<u>COUNT IV: MHRA</u>
<u>Failure to Accommodate</u>

128.    Paragraphs 1-127 are incorporated by reference.

129.    Access unlawfully failed to accommodate Linton's disabilities in violation of the

MHRA.

<u>COUNT V: ADA</u>
<u>Unlawful Disability Discrimination</u>

130.    Paragraphs 1-129 are incorporated by reference.

131.    Access's conduct constitutes unlawful disability discrimination against Linton in

violation of the ADA.

<u>COUNT VI: ADA</u>
<u>Unlawful Retaliation</u>

132.    Paragraphs 1-131 are incorporated by reference

133.    Access's conduct violated the ADA by retaliating against Linton because she

required and used medical leave as a reasonable accommodation for her disability.

<u>COUNT VII: ADA</u>
<u>Failure to Accommodate</u>

134.    Paragraphs 1-133 are incorporated by reference.

135.    Access unlawfully failed to accommodate Linton's disabilities in violation of the

MHRA.

<u>COUNT VIII: Title VII/PDA</u>
<u>Unlawful Discrimination</u>

136.    Paragraphs 1-135 are incorporated by reference.

137.    Access's conduct constitutes unlawful pregnancy discrimination against Linton in

violation of Title VII/PDA.

13

COUNT IX: Title VII/PDA
Unlawful Discrimination

138.    Paragraphs 1-137 are incorporated by reference.

139.    Access's conduct violated the violated Title VII/PDA by retaliating against Linton because she required and used and needed reasonable accommodations for her pregnancy-related conditions.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

(a)    Declare the conduct engaged in by Defendant to be in violation of her rights;

(b)    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

(c)    Order Defendant to employ her in her former position;

(d)    Award equitable-relief for back pay, benefits and prejudgment interest;

(e)    Award compensatory damages in an amount to be determined at trial;

(f)    Award punitive damages in an amount to be determined at trial;

(g)    Award liquidated damages in an amount to be determined at trial;

(h)    Award nominal damages;

(i)    Award attorney's fees, including legal expenses, and costs;

(j)    Award prejudgment interest;

(k)    Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability, sex (pregnancy) or retaliation;

(l)    Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination or retaliation in the future;

(m)     Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

(n)     Require that Defendant train all management level employees on the protections afforded by the MHRA, ADA and Title VII/PDA;

(o)     Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her because of discrimination and retaliation; and

(p)     Grant to Linton such other and further relief as may be just and proper.

Dated:  May 20, 2015

/s/ Chad T. Hansen
chansen@maineemployeerights.com

/s/ Peter Thompson
pthompson@maineemployeerights.com

Attorneys for the Plaintiff

MAINE EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343